IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DWIGHT DURAN, ET AL.,

       **Plaintiffs,**

vs.                                                                                     No. 77-cv-721 KK/SCY

MICHELLE LUJAN GRISHAM, ET AL.,

       **Defendants,**

## DECLARATION OF ALEXANDRA FREEDMAN SMITH

1. My name is Alexandra Freedman Smith. I am over eighteen years of age and competent to testify as to the matters set forth herein.

2. The matters set forth in this declaration are based on my personal knowledge.

3. I am lead counsel for the Plaintiffs' attorneys representing the Plaintiff Class in the above captioned matter.

4. I was appointed class counsel on February 16, 2017 in this case.

5. Since that time, I have worked vigorously to protect the interests of the class members I represent.

6. I have also had the privilege of leading the team of dedicated attorneys who represent the Plaintiff Class, Mark Donatelli, Peter Cubra, Phillip Davis, Katherine Loewe, Reed Bienvenu, and Nicholas Davis. Mr. Donatelli, Mr. Cubra, and Mr. Davis had been involved in this lawsuit for decades and provide class members with their experience and knowledge of this case as well as their continued hard work. Ms. Loewe, Mr. Bienvenu, Mr. Davis,

1

and I have devoted countless hours to this lawsuit since we began working on this case nearly three years ago.

7. During the last three years that I have been involved in the lawsuit, we received numerous complaints from inmates concerning overcrowding that was causing dangerous and unconstitutional conditions with the prisons covered by the *Duran* case.

8. We received these complaints in letters, in phone calls, and in visits with class members.

9. In response to these complaints, we requested tours of facilities and, ultimately, negotiated access agreements allowing Plaintiffs' counsel to tour the prisons.

10. Throughout the course of our representation, class counsel has toured each prison covered by *Duran*. Plaintiffs' class counsel has visited Western New Mexico Correctional Facility (WNMCF) three times, Northwestern New Mexico Correctional Facility (NWNMCF) three times, Otero County Prison Facility (OCPF) four times, Springer Correctional Facility (SCC) twice, Northeastern New Mexico Correctional Facility (NENMCF) twice, Central New Mexico Correctional Facility (CNMCF) twice, Southern New Mexico Correctional Facility (SNMCF) twice, Lea County Correctional Facility (LCCF) once, the Santa Fe Penitentiary once, and Guadalupe County Correctional Facility (GCCF) once. Class counsel have visited the prisons covered by this lawsuit a total of twenty-one times over the past three years.

11. I personally attended ten of these tours.

12. During these visits, we observed first-hand the conditions in which class members were living. We took extensive measurements of the dormitories, cells, and the spaces not designed for housing where class members had been housed. We have been to every place

2

within every prison where our class members have been housed, from cells and dormitories to medical cells and dayrooms.

13. During each of these visits, we have spoken with dozens of inmates. We spoke to some in the pods where they lived, and others in private meetings. Many of these conversations were lengthy. During these conversations, we listened to inmates tell us about the conditions in which they lived, the problems they were experiencing, their concerns, and their thoughts regarding how to remedy these problems.

14. Not only did we speak with class members during these tours, but throughout the litigation we have engaged in hundreds of phone calls with and responded to hundreds of letters from class members. During these phone calls, we have listened to our clients' concerns and acted on them both before and during the settlement negotiations.

15. Prior to the settlement negotiations that began in January of 2019, we filed several motions for relief for our clients. We filed Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief Regarding Violations of the Court's Stipulated Orders concerning violations of the 1991 Settlement Agreement at WNMCF, OCPF, SCC, and CNMCF [Doc. 2837], Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief at NWNMCF [Doc. 2928], and Plaintiffs' Motion for Declaratory, Injunctive, and Remedial Relief Regarding Violations of the 1991 Settlement Agreement at WNMCF [Doc. 2929].

16. We also sent several sets of discovery requests to Defendants to receive more information regarding conditions within the prisons. When Defendants failed to provide responses to these discovery requests, we successfully litigated a motion to compel [Doc. 2886].

17. Not only did we litigate to protect class members' interests, but we also negotiated with Defendants outside of court. We were able to resolve a double-celling issue at GCCF

3

without the need to file a motion. We negotiated two access agreements with opposing counsel. We also resolved many discovery disputes without the need for court intervention.

18. On December 5, 2018, Defendants filed their Motion for Immediate Termination of Prospective Relief Pursuant to 18 U.S.C. § 3626(b)(2). This motion to terminate the consent decree pursuant to the Prison Litigation Reform Act (PLRA) posed a serious threat to our clients. Shortly after this motion was filed, we entered into settlement negotiations.

19. We spoke with dozens of inmates on telephone calls regarding the conditions they in which they were living and sent out hundreds of letters to clients asking for information about the conditions in the prisons and what they were most concerned about.

20. Clients sent us approximately 100 letters explaining the issues they were experiencing. We also engaged in phone calls where they told us their concerns.

21. Our clients told us during the visits we made to the prisons, the letters we received, and the phone calls we had with clients what problems they were seeking to remedy in settlement negotiations.

22. They had concerns about overcrowding, particularly in the dormitories at NWNMCF, WNMCF, SCC, and OCPF. This led to violence and tension between inmates. Class members at NWNMCF and WNMCF reported that there was a rodent infestation. Class members reported widespread plumbing problems. They also reported difficulty getting released from prison timely and having to serve in-house parole. At SCC, class members reported problems with the water supply. There were concerns at many facilities regarding understaffing. Many class members reported that there were not sufficient opportunities for programming, employment, and the ability to earn good time. There were concerns about classification problems. Inmates at some facilities reported problems with the heat.

4

Others reported problems with medical care. Class members told us that they had serious concerns that they were being retaliated against for reporting violations of the Prison Rape Elimination Act (PREA).

23. We used this information to formulate the settlement demands for our clients throughout the negotiations.

24. Before, during, and after the settlement negotiations, we remained in touch with class members engaging in many telephone calls, sending letters, and responding to letters.

25. We negotiated for five months to reach the first settlement agreement we brought before this Court. These were arms-length negotiations that were contentious and difficult. We had three mediations with Judge Yarbrough as well as several other meetings and phone calls where we negotiated with opposing counsel. There were several times when the negotiations nearly fell apart.

26. After this Court voiced concerns about the May settlement agreement, the parties continued their negotiations. These were also difficult negotiations that nearly fell apart.

27. We kept in touch with class members during this time through telephone calls and letters. We provided updates to clients on the status of the settlement negotiations and answered their questions.

28. Ultimately, we were able to address most of our clients' concerns in the settlement agreement. We fought very hard to make sure that their voices were heard and that we obtained the best terms possible for them. The relief we obtained was directly informed by what they had told us.

29. Once this Court granted preliminary approval of the RSA on September 5, 2019, notice was sent to all clients informing them as to the terms of the RSA.

5

30. We received many letters from class members regarding the settlement. I personally spoke with numerous class members regarding the settlement agreement during the objection period. Many of these class members expressed their approval of the agreement. Many had questions about when they would receive remedial relief. Others had concerns.

31. When I spoke with clients who had concerns about the agreement, I explained the agreement to the best of my ability and told them that they could also send their objections to the Court, and explained how to do that. I spoke directly with some of the inmates who filed objections.

32. Plaintiffs' counsel also visited the facilities at which the majority of the objectors were housed. Plaintiffs' counsel visited OCPF, SNMCF, and NENMCF (70 out of 92 objectors were housed in these facilities) and met with the objectors at those prisons to discuss the RSA.

33. Plaintiffs' counsel has worked diligently over the last three years to protect our clients' interests and to negotiate the best possible settlement relief we could obtain informed directly by our communications with our clients.

34. We have engaged actively throughout the process with our clients, getting their input, listening to their concerns, and achieving remedies that addressed these concerns in the RSA.

35. I believe that we have obtained the best result possible for our clients.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 3, 2020

Signed _____

I hereby certify that a true and correct copy
of the foregoing pleading was emailed to
opposing counsel and served on them through
the CM/ECF system on this 3rd day of
February, 2020.

*/s/ Alexandra Freedman Smith*